UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PAUL A. LEVINE, as the permanent receiver of Prime Capital Ventures, LLC, CHRISTIAN H. DRIBUSCH, as the Chapter 7 trustee of Kris Daniel Roglieri, and COMPASS-CHARLOTTE 1031, LLC,<br><br>          Appellants,<br> v.<br><br>B AND R ACQUISITION PARTNERS, LLC and JHM LENDING VENTURES, LLC,<br><br>          Appellees. | Civil Case No. 24-cv-00939-MAD |

**APPELLANTS' JOINT REPLY IN SUPPORT OF
JOINT MOTION FOR STAY PENDING APPEAL**

**PRELIMINARY STATEMENT**

  1.  Both the Joint Motion[1] and this appeal are easily resolved. In its March 19, 2024 Decision and Order, this Court has already interpreted its receivership order as permitting the Receiver to file litigation claims and obtain legal remedies to protect assets of the receivership estate. Compass Docket No. 160 at 53 (granting Receiver a pre-judgment attachment against third parties in connection with third-party complaint). *See Levine Declaration* (Civil Case No. 24-cv-00939-MAD, Docket No. 2-3, Exhibit B). The New York Supreme Court relied upon that interpretation by this Court in holding that the Receiver was in charge of Prime's legal affairs as part of his control over the "operations and business affairs" of Prime. *Id.*, Exhibit F (April 18, 2024 order holding that Paul Levine was in charge of hiring attorneys, and deciding whether to settle or litigate matters for Prime because "[a]fter all, the district court permitted the federal third-party action commenced by the receiver to proceed. Presumably the district court would not have

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Joint Motion (Civil Case No. 24-cv-00939-MAD, Docket No. 2).

1

done so if the receiver was not in charge of the company's legal affairs") **The prior interpretation by the Court of its own order is dispositive of this appeal, and no further analysis is necessary.** Indeed, Appellees appear to realize their Achilles heel on this point as they do not even bother to address this pivotal issue in their response brief. Rather, they implicitly argue that the Court should reject its prior interpretation of its own order (as well as the same interpretation by the New York Supreme Court) and now find that the Receiver has no authority under the Permanent Receiver Order to take any legal actions to protect assets of the receivership estate. The Court should reject this request to reverse its prior March 19, 2024 Decision and Order.

2. If the Court chooses to review this matter past the initial dispositive issue of interpreting its own prior order, it is clear that a stay pending appeal is required and Appellants have satisfied all required factors. The reasons and arguments for a stay are laid out in detail in the Joint Motion, but Appellants list below the errors in Appellees' response.

    **A.**    **Appellees Ignore This Court's Prior Ruling That Irreparable Injury Exists if Receivership Assets are Dissipated by Other Creditors of Prime and Compass is Left with an Uncollectible Judgment**.

3. Appellees acknowledge that they want to take the entire value of the Virginia Beach Property for themselves and that without a stay they intend to do so. However, they argue that allowing them to take this asset to the detriment of all other victims of Prime will not cause an irreparable injury as: (a) Prime has other assets; and (b) the Virginia Beach Property is allegedly only 6% of Prime's known assets. Both points are wrong.

4. First, this Court has already held that in the context of an insolvent entity, a creditor is irreparably harmed if other creditors are allowed to dissipate the available assets while that creditor seeks a judgment. Compass Docket No. 160 at 25-29 ("The Court agrees that the appropriate standard to determine whether irreparable harm will occur from the unenforceability

of a money judgment is whether insolvency is likely and imminent."). Every party to this appeal admits that Prime ran a Ponzi scheme which harmed numerous victims (including Compass) and that Prime is entirely insolvent. *See generally Janvey v. Alquire*, 647 F.3d 585 (5th Cir. 2011) (finding that receiver carried burden of showing irreparable injury to support injunction to freeze assets of debtor who ran a Ponzi scheme since dissipation of assets would impair court's ability to grant an effective remedy). Appellees offer no reason for the Court to reverse its prior holding or apply a different standard, especially in the face of Prime's undisputed insolvency, the scope of which by both dollar amount and number of victims has grown exponentially.

5.  Second, Appellees' claim that the Virginia Beach Property is only 6% of Prime's assets is entirely misleading. As set forth in Prime's bankruptcy schedules, Prime's estate consists of certain limited hard, tangible assets, including the Virginia Beach Property valued at $3,750,000.00, cash of approximately $1,976,300.00, and a luxury watch valued at $2,275,000.00[2]. *See* **Exhibit A** to the accompanying Supplemental Declaration of the Receiver. Collectively, those tangible assets aggregate approximately $8,000,000.00 in value, with the Virginia Beach Property representing nearly 50% of the tangible assets of the estate. The other assets of the Prime estate are causes of action and claims against various entities around the country, as well as loan receivables. By definition, the causes of action and claims are not liquidated, will take substantial time and money to liquidate, may or may not result in money judgements, and ultimately may or may not be collectible in full or in part.[3] Moreover, the loan

---

[2] Prime's bankruptcy schedules also list a number of high-end automobiles as property of its estate. Those automobiles have been seized by the FBI. At present, it is uncertain whether the automobiles will be liquidated for the benefit of Prime's estate.

[3] Indeed, if Appellees' position were adopted, the Receiver would not even have any rights over, or ability to pursue, such causes of action.

18187644.v4

receivables have long maturities and whether and in what amount they may be repaid is uncertain at the present time.

6. Consequently, the reality is that the Virginia Beach Property is the single most valuable tangible hard asset of the Prime estate, and every dollar of its value is important. To put it into context, Prime's bankruptcy schedules set forth approximately $125,973,314.50 of potential claims against Prime. Therefore, putting aside Prime's non-tangible assets, the value of which is speculative, if Prime forfeits the ability to liquidate the Virgina Beach Property for the benefit of all creditors, the other creditor victims of the Ponzi scheme would effectively be funding Appellees' windfall with dollars that should be shared by all.

7. Further, in the Objection, Appellees assert that Appellants' argument that absent a stay there may be a "race to the courthouse" does not constitute irreparable harm because the Trustee and the Receiver have legal mechanisms to pursue the orderly distribution of Prime's assets, including re-filing of Prime's bankruptcy case. However, Appellees conveniently turn a blind eye to the Dismissal Order's holding that "Under Delaware law, "[a] person ceases to be a member of a limited liability company upon" the filing of a voluntary bankruptcy petition. 6 Del. C. § 18-304(1)(b)." Thus, the incongruous result would be that because: (i) Roglieri was the 100% sole member of Prime; (ii) Prime was managed by its "Voting Members"; (iii) once Roglieri filed for personal bankruptcy he ceased to be member of Prime, Prime would have no members or managers; and (iv) no one (not even the Trustee) would have the authority to file a voluntary bankruptcy for Prime. Therefore, Appellees' assertion that Appellants will not suffer irreparable harm if the stay is not granted is simply without merit. Absent a stay pending this appeal, under the ruling of the Dismissal Order, Appellants are stripped of any authority to re-file Prime's bankruptcy case, leaving the floodgates open for numerous parties to immediately continue and/or

commence litigation in a host of jurisdictions, potentially forcing the Receiver to simultaneously defend all such lawsuits at great expense, thus causing Appellants to suffer actual and imminent injury.

> **B.    Appellees Ignore the Fact That They Will Have No Injury at all if the Receiver is Allowed to Move Forward with Selling the Virginia Beach Property Pending Appeal**.

8.    Appellees attempt to manufacture an injury they could sustain if there is a stay pending appeal.  They argue that any stay of their legal rights is an injury and the Virginia Beach House might deteriorate in value during an appeal.  But Appellees entirely ignore the facts that (a) all parties' interests are aligned to sell the Virginia Beach House and turn it into cash as quickly as possible by working together to accomplish a sale during the appeal process with the proceeds being held in escrow at interest or otherwise paid into this Court as may be directed; (b) the Receiver can sell the Property as quickly (or quicker) than Appellees could, since Appellees would have to go through a lengthy Virginia state court execution process which would require them to file a court action and seek a court order allowing for the sheriff or commissioner to sell the property[4]; and (c) a sale by the Receiver through a real estate broker and a regular owner / buyer sale process is far more likely to maximize the value of the property than an execution sale.  Market sales between a motivated seller and a motivated buyer do better than forced liquidations. *See BFP v. Resolution Trust Corp.*, 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994) ("That suspicion becomes a certitude when one considers that market value, as it is commonly understood, has no applicability in the forced-sale context; indeed, it is the very antithesis of forced-sale value.").

---

[4] *See* Virginia Code 8.01-462. Jurisdiction of equity to enforce lien of judgment; when it may decree sale. ("Jurisdiction to enforce the lien of a judgment shall be in equity. If it appears to the court that the rents and profits of all real estate subject to the lien will not satisfy the judgment in five years, the court may decree such real estate, or any part thereof, to be sold, and the proceeds applied to the discharge of the judgment.")

18187644.v4

When these facts are taken into consideration, it is clear that Appellees will not suffer *any* injury from a stay pending appeal, let alone a *substantial* injury.

>  **C. Appellants are Likely to Succeed on Appeal, or at a Bare Minimum, Have a Substantial Possibility of Success on Appeal.**

9. As courts have held, to satisfy "substantial possibility", a movant's success on appeal only needs to be possible, not probable. *See In re Anderson*, 560 B.R. 84 (S.D.N.Y. 2016) ("The 'substantial possibility of success' test is considered an intermediate level between 'possible' and 'probable' and is 'intended to eliminate frivolous appeals.'"). Moreover, courts have also granted a stay pending appeal when a movant's likelihood of success is not high, but the balance of hardships favors the movant. *See Wells Fargo Bank, N.A. v. ESM Fund I, LP*, Case No. 10 Civ. 7331 (AJN) 2012 WL 3023985, at *1 (S.D.N.Y. July 24, 2012) ("A party need not show a high likelihood of success if it can demonstrate that the balance of hardships tips decidedly in its favor."). *See also 29 Brooklyn, LLC v. Chesley*, Case No. 15-CV-5180 (ARR), 2015 WL 9255549, at *2 (E.D.N.Y. Dec. 16, 2015) ("The "showing of substantial possibility of success is inversely proportional to the amount of irreparable injury,"….").

10. This appeal is far from frivolous. Appellants have demonstrated, at a bare minimum, a substantial possibility of succeeding.

11. Upon a debtor's filing for bankruptcy, an estate is created which includes "all legal or equitable interests of the debtor in property as of the commencement of the case." 11 U.S.C. 541(a)(1). Such property interests are generally interpreted under state law. *See Butner v. United States*, 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts

within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving "a windfall merely by reason of the happenstance of bankruptcy".).

12. Because Prime is a Delaware limited liability company, Delaware law applies. There can be no question that on the date of his bankruptcy filing, Roglieri's 100% membership interests in Prime were personal property under Delaware law and property of his bankruptcy estate. *See* 6 Del. C. § 18–701 (providing that "a limited liability company interest is personal property...").

13. Once a chapter 7 trustee is appointed, the trustee possesses all the rights of the debtor and essentially "steps into the shoes of the debtor." *See Omanoff v. Riefler (In re Reifler),* Case No. 22–CV–10201 (CS), 2023 WL 5510233, at *6 (S.D.N.Y. 2023) ("When a bankruptcy petition is filed under Chapter 7 of the Bankruptcy Code, …, a Chapter 7 Trustee is charged with the administration of the debtor's estate for the benefit of the estate's creditors. The Bankruptcy Trustee "steps into the shoes of the debtor" and "possesses only the rights of the debtor."). Therefore, since Roglieri (the debtor) had the right to ratify the Prime bankruptcy filing, the Trustee would have the same right regardless of when he was appointed.

14. Under Delaware law, the management of an LLC is vested in the members unless the LLC agreement provides otherwise. 6 Del. C. § 18-402; *See In re Reifler* at 8-9 ("…Delaware's default rule provides that "the management of a limited liability company shall be vested in its members,"…"); *See also Great Lakes Chem. Corp. v. Monsanto Co.*, 96 F.Supp.2d 376, 391 (D.Del.2000) ("The Delaware Limited Liability Company Act … establishes the default rule that management of an LLC shall be vested in its members, but permits members to establish other forms of governance in their LLC agreements."). If an LLC agreement provides for the

7

management of the LLC by member(s), such member(s) shall have the responsibilities accorded to them by or in the manner provided in the LLC agreement. 6 Del. C. § 18-402.

15. Prime's limited liability company agreement states that Prime is managed by its "Voting Members". *See **Exhibit B*** to the accompanying Supplemental Declaration of the Receiver, Section 2.4. Thus, the Trustee succeeded to Roglieri's 100% membership interest in Prime, including the right to manage Prime in accordance with the Debtor's operating agreement.[5] Accordingly, because Roglieri was the sole member of Prime on May 14, 2024, the day the Receiver filed the Prime bankruptcy petition, the Trustee, regardless of when he was appointed, succeeds to that authority, and therefore clearly had the right to ratify the filing of the Prime bankruptcy by the Receiver. When he filed his personal bankruptcy case, Roglieri made all of his assets subject to the control of the Trustee who was thereafter appointed. To somehow divide those assets, as the lower court does, based on timing and the "happenstance" of a bankruptcy eviscerates the plain meaning of Bankruptcy Code §541 as affirmed by the Supreme Court in *Butner, 99* S.Ct. 914 at 55.

16. Appellees have wholly failed to address the merits of the *Envision* case, which is directly on point with the issue before the Court upon appeal. Appellees reference *Envision* briefly, casually dismissing it as "a single bankruptcy judge in Texas . . ." whose ruling stands alone, holding that a statutory provision which improperly stripped the rights of a party as a result of a

---

[5] Indeed, counsel for Kris Roglieri (Pieter Van Tol) specifically conceded this point before the Bankruptcy Court. *See* Roglieri Bankruptcy (24-10157), Docket No. 204, Audio recording at 23:00-25:00 (agreeing with Trustee's interpretation of caselaw that bankruptcy estate had all rights of management of debtor's solely owned LLC and Roglieri no longer had any right to manage LLC's affairs after conversion of bankruptcy case to Chapter 7). Since the only pre-petition member of Prime concedes that he no longer has any management rights for his wholly owned entities, it is hard to see how Appellees who are not parties to the Prime operating agreement have any standing to push for a contrary result. Indeed, it would be entirely impracticable to return any management rights to Roglieri who remains in prison without possibility of detention based on threats to "seek vengeance against the attorneys, the judge, and the receiver" and a threat to "put a bullet in [an FBI] agent's head." *See United States v. Roglieri*, 1:24-mj-00261 (N.D.N.Y.), Docket No. 32 (August 5, 2024 order denying Roglieri request for new detention hearing).

bankruptcy filing is preempted by federal bankruptcy law. *See* Objection, pg. 24. The short shrift given to the *Envision* case by the Appellees is not surprising, since they are unable to distinguish the case, which "clarifies that a member of a Delaware LLC who starts a bankruptcy case keeps *all* legal and equitable interests in the LLC that it held as of the commencement of the case." *In re Envision Healthcare Corp.*, 655 B.R. 701, 711 (Bankr. S.D. Tex. 2023).

17.     The *Envision* case is not a random outlier, as the decision cites and relies upon multiple other courts who have come to the same conclusions with respect to similar statutory provisions in other states, including a 2022 Southern District of New York case. *Id.* at 711-12.; *Weiss v. All Year Holdings Ltd. (In re All Year Holdings Ltd.)*, 648 B.R. 434, 456 (S.D.N.Y. 2022), appeal withdrawn, No. 23-71, 2023 WL 2944995 (2d Cir. Feb. 1, 2023) ("…laws cannot be read to terminate or modify LLC membership interests solely due to a bankruptcy filing,…", and under the appellant's reading of state law, "…[debtor's] membership interest would be terminated, *ipso facto*, solely due to its chapter 11 filing. As Section 541(c) squarely precludes that result, the Bankruptcy Code must prevail over Appellant's reading of [state law]."). Indeed, the Joint Motion cites five separate cases where a court has held that a similar statute that dispossessed a party of its rights upon the filing of a bankruptcy case were preempted by the Bankruptcy Code. *See* Joint Motion, ¶ 46.

18.     Appellees have also suggested that Prime's operating agreement is fatal to the Motion. Through the Objection, they incorrectly assert that Prime's operating agreement evidenced that the Trustee does not have control over the Debtor. While that position is consistent with the Dismissal Order, it is clearly violative of the Bankruptcy Code and clearly reversible error. Section 6.4 of the Prime's operating agreement, which was relied upon by the Bankruptcy Court in determining that the Trustee lacked managerial authority over Prime, is an unenforceable

9

*ipso facto* clause.  It provides, in part, that a member's bankruptcy constitutes a breach of the operating agreement and that the creditor, or transferee, shall have rights as an assignee.  This language is in direct conflict with the Bankruptcy Code, which provides that

> [A]n interest of the debtor in property becomes property of the estate under subsection (a)(1), (a)(2), or (a)(5) of this section notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law – (B) that is conditioned on the insolvency or financial condition of the debtor, on the commencement of a case under this title, or on the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1)(B).  Parties to an operating agreement "cannot contract around what becomes estate property . . . ." *Envision*, 655 B.R. at 710.  As such, the Trustee was well within his authority to ratify the Prime Chapter 11 Case filing.  The lower court and Appellees also fail to recognize that §6.4 is meant to protect nonbankrupt members of the LLC from becoming partners with a creditor or a trustee of a bankrupt member which, in the case of this single member LLC, simply does not apply.  The provision is not, however, surplusage, inasmuch as the operating agreement contemplates at §2.7 the possibility of the admission of new members.

### D. Appellees Confuse the Merits of the Appeal with the Public Interest.

19. Appellees do not dispute that all victims of Prime's Ponzi scheme deserve equitable and fair treatment with a pro rata distribution of available assets.  Rather, they argue that the public has some amorphous interest in not having "unauthorized" bankruptcy filings.  But this argument confuses the merits of the appeal with the reasons for a stay.  The question of whether the bankruptcy filing was "authorized" is *the* substantive issue of the appeal, and is part of the analysis regarding the third prong of the four-part test (*i.e.* likelihood of success on the merits).  In essence, Appellees' argument is: "We are going to win on appeal, and therefore the public has an interest

10

18187644.v4

in us winning as quickly as possible, so you should not grant a stay." Such an argument is circular and, if adopted, would entirely misread this prong of the test. Indeed, Appellants can just as readily make the same argument: "We are going to win on appeal, and the public has an interest in making sure that *authorized* bankruptcy petitions are not improperly dismissed." In either case, "public policy strongly favors the correct application of the Bankruptcy Code, especially where property rights are at stake". *In re Revel Ac, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015) (reversing district court denial of stay pending appeal from bankruptcy court order authorizing sale of property). The only way to maintain the status quo pending appeal and ensure proper application of the Bankruptcy Code (including the goal of preserving valuable estate assets in the form of preference avoidance claims and to preserve the automatic stay so that other estate assets are not subject to numerous lawsuits) is to grant the requested stay.

## CONCLUSION

20.     Through the Joint Motion, Appellants do not ask the Court to change anything, but to "simply suspend judicial alteration of the status quo" pending appeal. *Nken v. Holder*, 556 U.S. 418, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009). Without such a stay, Appellants will be irreparably injured and one creditor may make off with the most valuable physical asset of the receivership estate, to the detriment of every other one of Prime's Ponzi victims. Accordingly, the Joint Motion must be granted.

[Signature Pages Follow]

Dated: August 5, 2024
     Syracuse, New York        BOND, SCHOENECK & KING, PLLC

By:     */s/ Stephen A. Donato*
     Stephen A. Donato (Bar Roll No. 101522)
     Edward J. LoBello (Bar Roll No. 512829)
     Justin S. Krell (Bar Roll No. 704364)
     One Lincoln Center
     Syracuse, New York 13202
     Tel: (315) 218-8000
     Fax: (315) 218-8100
     Email: sdonato@bsk.com
            elobello@bsk.com
            jkrell@bsk.com

*Proposed Counsel to Prime Capital Ventures, LLC*

Dated: August 5, 2024
     Albany, New York        THE DRIBUSCH LAW FIRM

By:    /s/ *Christian H. Dribusch*
     Christian H. Dribusch, Esq.
     187 Wolf Road
     Suite 300-020
     Albany, New York 12205
     Telephone No.: (518) 227-0026
     Email: cdribusch@chd-law.com

*Chapter 7 Trustee of the
  Estate of Daniel Kris Roglieri*

Dated: August 5, 2024
      Albany, New York        NOLAN HELLER KAUFFMAN LLP

By:   */s/ Justin A. Heller*
     Justin A. Heller, Esq.
     Matthew M. Zapala, Esq.
     80 North Pearl Street, 11th Floor
     Albany, New York 12207
     (518) 449-3300

PARKER POE ADAMS & BERNSTEIN LLP

     William L. Esser IV, Esq. (pro hac vice)
     620 South Tryon Street
     Suite 800
     Charlotte, North Carolina 28202
     Telephone No.: (704) 335-9507
     Fax No.: (704) 334-4706
     Email: willesser@parkerpoe.com

*Counsel for Compass-Charlotte 1031, LLC*

18187644.v4